351 P.2d 643

Eva L. PARNAU, Petitioner,

v.

INDUSTRIAL COMMISSION OF ARIZONA, and E. S. Kearns and E. F. Massingle (Food Fair), Respondents.

No. 6834.

Supreme Court of Arizona.

May 4, 1960.

Rehearing Denied May 31, 1960.

362

Robert E. Yount, Scottsdale, for petitioner.

James D. Lester, Phoenix, for respondent, Industrial Commission of Arizona, Donald J. Morgan, Frances M. Long, Phoenix, Edward E. Davis, Glendale, of counsel.

JOHNSON, Justice.

Petitioner, Eva L. Parnau, sustained a compensable injury in an industrial accident on February 10, 1948. Applicant was operated upon and then seen in consultation by the Medical Advisory Board in March of 1950, as a result of which it was determined that she had sustained a 20 per cent general physical functional disability attributable to her injury. On the basis of a further consultation in December of 1950, which found her condition to be stationary requiring no further treatment, the Commission rendered its final award compensating petitioner for a 25 per cent loss of earning capacity.

Thereafter, petitioner initiated a series of applications to reopen on the basis of a new, additional or previously undiscovered disability, each of which was denied by the Commission on the ground she had failed to present evidence of such undiscovered disability. Finally, on May 22, 1958, petitioner filed her last petition and application for reopening of the award. In support thereof, there was filed a report by Dr. Aidan A. Raney, an orthopedic surgeon of Los Angeles, California.

This petition to reopen was denied, and a petition for rehearing was filed. Formal hearing was held September 29, 1958, at which time medical testimony was taken. On an investigative basis, the Commission then ordered petitioner examined in group consultation on October 17, 1958 by a neurologist, Dr. William B. Helme; two orthopedic surgeons, James Lytton-Smith and W. A. Bishop, Jr.; a psychiatrist, Dr. William B. McGrath and the Commission's medical advisor, Dr. James R. Moore. A report consisting of medical findings and opinions was made, and formal hearing again was held on December 10, 1958, at which time the testimony of Doctors Bishop, Lytton-Smith, Moore and McGrath was recorded.

The Commission thereupon entered its decision affirming its previous findings and award. That final award is the subject of the present certiorari action.

■ At the time of petitioner's injury, § 56–957(c) and (d), A.C.A.1939 was in effect, and not the amending statute A.R.S. § 23–1044, subd. F. We have held that the 1953 Amendment, affecting vested rights, is substantive legislation and can not be accorded retroactive application. Gallo v. Industrial Commission of Arizona, 83 Ariz. 392, 322 P.2d 372. Consequently, the burden lies with petitioner, Hunter v. Wm. Peper Construction Co., 46 Ariz. 465, 52 P.2d 472, to establish that there exists a new and additional disability which was unknown and not considered at the time of the original award. Jastrzebski v. Wasielewski, 82 Ariz. 92, 308 P.2d 937; Harambasic v. Barrett & Hilp & Macco Corp., 58 Ariz. 319, 119 P.2d 932. If petitioner fails to sustain its burden, she is not entitled to a reopening of the award.

■ It is well settled in this jurisdiction that this Court will not upset the findings of the Commission where there is a conflict in the competent evidence, upon which it based its findings, which is such that reasonable men might differ as to the fact. Jastrzebski v. Wasielewski, supra. Furthermore, it must be borne in mind that unless the result of an industrial accident is one which clearly is apparent to ordinary laymen, such as the loss of limb or an external lesion, the question as to physical condition of an injured employee after an accident and the causal relation of the accident to such condition usually can be answered only by expert medical testimony. Caekos v. Stanley Fruit Co., 55 Ariz. 72, 98 P.2d 471.

The Commission finding that is the subject of the instant matter is this:

That applicant does not have any new, additional or previously undiscovered disability attributable to this injury by accident arising out of and in the course of her employment on February 10, 1948.

The precise issue is whether this finding reasonably is supported by competent evidence.

From the report of the group consultation of October 17, 1958, we quote:

"X-Rays: The x-rays were reviewed and compared with the previous radiographs taken before the case was closed in 1950. These show definite increase in proliferative and degenerative changes, particularly about C–5 and C–6. The changes are of a character which would be anticipated following the surgery which was performed.

"Comments: From a review of the record and the history and physical examination as recorded above, it is our opinion that there is no evidence of new and additional disability attributable to the injury sustained in the accident of February 10, 1948 as compared

to the condition as recorded at the time she was last seen in consultation on December 14, 1950.

"The minor differences in the physical findings as recorded at previous consultations and at this time, are not indicative of progressive pathology and do not represent objective evidence of increased disability. The x-ray changes which have been noted in the cervical spine are those which might reasonably be expected to occur over such a period of time and following surgical intervention as would occur in this case.

"There are objective evidence of disability which could be logically attributable to that injury which have previously been estimated as equivalent to a 20% general physical functional disability."

It is petitioner's contention that she can no longer work in her usual occupation of a meat wrapper because of a change in her employability attributable to the industrial injury of 1948. In support of this contention applicant relies upon the proliferative and degenerative changes evidenced by the x-rays. Dr. James Lytton-Smith testified:

"Q. Were there any medical findings, Doctor, over and above the medical findings reported on the December, 1950 examination? A. Yes, there were some changes, radiographically; physically, we didn't find any

appreciable amount, but there were some changes radiographically.

"Q. Now you are speaking of X-ray changes? A. Yes.

"Q. And X-ray changes with respect to the cervical spine? A. Yes.

"Q. Were those X-ray changes over the entire cervical spine or not? A. No, they were pretty much localized through the area of surgery.

"Q. Which was C–5, 6, and 7? A. Yes, in that region.

"Q. Do you have an opinion, Doctor, as to the cause of those changes? A. I think the changes in the cervical spine were the result of injury, secondly, the result of surgery, which is inevitable, and third, the reparative changes that occur over a period of years following these two things and following an increased age, and wear and tear.

"Q. In other words, the increased X-ray changes, or rather, the X-ray changes shown to have increased, in your opinion were due to a combination of the original injury, the surgery as well as old age or degenerative processes? A. That's right.

\*    \*    \*    \*    \*    \*

"Q. I may be a little confused now in the light of the last paragraph of the comments of the consultation physicians who saw you with her on

October 17th this year. Does that paragraph indicate or mean that in your opinion Mrs. Parnau at the present time still has only a 20 per cent general physical functional disability? A. Yes.

"Q. Doctor, that is the same percentage of disability attributed to Mrs. Parnau as a result of the consultation of December 14, 1950, and which was made a specific finding in the award favoring Mrs. Parnau, which was rendered by the Commission back in January of 1951. It seems to me that perhaps that opinion may fly directly in the face of other testimony to the effect that the X-ray changes have increased. Do I understand, then, that even though in your opinion they can be partially attributed to the original injury and surgery, that in your opinion that increase still does not constitute additional disability? A. That is correct."

Dr. James R. Moore testified that in his opinion petitioner had no additional or increased disability attributable to the injury, even though the X-rays indicated certain changes. Doctors W. A. Bishop, Jr., and William B. McGrath additionally testified that petitioner's alleged increased disability stemmed from a functional or psychoneurotic basis and not from any organic cause. From the testimony of Dr. Bishop:

"Q. Now you also spoke of increased functional elements. A. Well, for example, she had complaint of hypalgesia over the ophthalmic division of the trigeminal nerve on the left. That would be a strip from the ear up over about the eye, and also it involved the C-2 and 3 distribution over the scalp. This was nonanatomic in distribution, and it varied from time to time when she was examined. It was quite apparent also that we did not have her full cooperation in testing for muscle strength, the degree of atrophy present did not go along at all with the loss of power, which it was a very minor degree, in fact, it is questionable whether she had any. There was a half inch difference, the right biceps being a half inch larger than the left, and the right forearm a quarter of an inch larger than the left; That is a normal variation. There was a question as to the patient's cooperation in determining the grip because obviously she wasn't putting forth the effort that could be put forth, and that was estimated by the muscle tone and by the muscle lack of atrophy which would indicate that the muscle was more functional than she was using it for at the time of the examination. I think that concludes most of the functional factors.'

"Q. Now these were functional factors which were—A. Those were present to a degree previously, but—

"Q. Not to the extent that they were? A. Not to the extent she had. There was a difference, it was the same type of a thing except it was different and more pronounced this time than previously.

\*      \*      \*      \*      \*      \*

"Q. Then would it be a fair statement to say that in your opinion any disability, any working disability which she believes she has at the present time, is on a functional basis? A. That's right.

"Q. Now, Doctor, do you feel qualified to render an opinion as to whether the functional elements we have just spoken about are in any way causally related to the injury? A. I wouldn't have an opinion regarding that except that there has been a time when she wasn't, I can't see why subject to that it would be logical that she would, as a result of that injury, subsequently then have a functional condition, which would disable her when the effects of the injury have been stable for a long time."

Dr. William B. McGrath specifically testified that no cause-effect relationship existed between the psychoneurotic condition and the industrial accident and injury.

Following our often-repeated rule that in review by certiorari this Court does not weigh testimony or resolve conflicts therein, but only searches the record to see whether the Commission's findings are reasonably supported by the evidence, McGill v. Industrial Commission, 82 Ariz. 36, 307 P.2d 1042, we are satisfied in the instant case that the finding of the Commission is supported by the substantial evidence.

Award affirmed.

STRUCKMEYER, C. J., and PHELPS, UDALL and BERNSTEIN, JJ., concur.